FILED
2020 NOV 23 AM 10:53
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ADRIANA CLARK,<br><br>Plaintiff,<br><br>v.<br><br>VIVINT SOLAR, INC.,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00144-JNP-JCB<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Jared C. Bennett |

This matter is before the court on Defendant Vivint Solar's ("Vivint" or "Defendant") Motion for Summary Judgment (the "Motion"). ECF No. 70. Plaintiff Adriana Clark ("Clark" or "Plaintiff") brings this employment discrimination suit under the Equal Pay Act and Title VII of the 1964 Civil Rights Act ("Title VII"), claiming Vivint discriminated against her both in her wage and in the disparate workplace treatment she experienced based on her gender and religion. She also claims Vivint retaliated against her for filing internal complaints. Having considered the parties' memoranda and argument presented at the hearing on October 20, 2020, the court grants in part and denies in part Defendant's Motion.

## I.    BACKGROUND[1]

This dispute arises from Clark's employment at Vivint in various human resources ("HR") positions, during which she alleges that Vivint paid her unequally because of her gender and

---

[1] The court recites the record facts in the light most favorable to Plaintiff as non-movant, resolving all factual disputes and drawing all reasonable inferences in her favor. *See Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015).

religion, treated her in a discriminatory manner on the same grounds, and retaliated against her for filing complaints of gender discrimination. Clark's wage discrimination claims are based on her allegations that, because she is female and does not subscribe to the teachings of The Church of Jesus Christ of Latter-day Saints (the "LDS Church"), she was paid less than two of Vivint's male employees who are members of the LDS Church, Scott Strong ("Strong") and Anthony Allred ("Allred").

### A.    HR GENERALIST ROLE

Clark began working at Vivint as an HR Generalist on November 11, 2013. In this role, Vivint paid Clark $60,000/year, with a potential 5% bonus. Vivint did not give Clark an office while employed in this position. As an HR Generalist, Clark's duties included employee onboarding, performance management, discipline, career development, recruiting, and managing employee relations activities by conducting investigations of employee misconduct and addressing employee performance issues. Plaintiff claims that when Vivint first hired her, she was the only person conducting employee relations duties at the company and that she would record employee relations investigations on a spreadsheet called the HR Tracker. During the period relevant to this litigation, Clark's direct supervisor was Director of Human Capital Matthew Sadowski ("Sadowski") and her department head was Vice President of Human Capital Tessa White ("White"). Clark does not claim that she was paid discriminatorily as an HR Generalist during the period of November 11, 2013 to October 20, 2014. *See* ECF No. 70–2 at 6.

### B.    HUMAN CAPITAL OPERATIONS MANAGER ROLE

On October 20, 2014, Vivint promoted Clark to Human Capital Operations Manager. At this time, Clark did not receive any pay raise, office, or additional benefits. When White offered Clark the position, White informed Clark that she would be taking over Strong's duties. Vivint had hired Strong in April 2014 under the title Director of Human Capital Operations and terminated

his employment in October 2014 after offering him a ten-week severance package. In this role, Strong earned $105,000/year plus a 15% bonus. Strong's job description indicates that he "handle[d] performance management, organization effectiveness, compensation and benefits, onboarding, and training." ECF No. 82–5 at 4. Strong's other responsibilities included developing and implementing organization and human capital strategies through "talent acquisition, staffing, employment processing, compensation, training and development, records management, safety and health, succession planning, employee relations and retention, AAEEO compliance, and labor relations." *Id.*; *see also* ECF No. 70–4 at 21 (White describing Strong's duties as implementing processes concerning "onboarding, adjudications, I-9's, audits, criminal background checks").

After her promotion to Human Capital Operations Manager, Clark took over managing Strong's team of eighteen employee direct reports. *See* ECF No. 70–2 at 6. In this role, Clark was responsible for all the post-hiring employment issues for all Vivint employees. This included supervising a team of HR Coordinators; employee performance management; employee relations duties including conducting misconduct investigations; and onboarding duties that involved background checks, drug testing, preparing offer letters, and ensuring that I-9 tax forms and non-compete agreements were properly completed. *See id.* at 7, 10–11.

## C.   HUMAN CAPITAL MANAGER EAST REGION ROLE

In February 2015, Vivint promoted Clark to the Human Capital Manager of the East Region position. By this time, Clark had ten years of experience as an HR professional. As Human Capital Manager of the East Region, Clark was initially responsible for HR obligations in fifteen offices in four states with the number of states in her purview expected to increase to eight by the end of 2015. Specifically, Clark at first supported HR functions concerning both sales and operations employees in these offices, mostly splitting her job between employee relations and onboarding

3

duties. She had five employees directly reporting to her. Clark had a counterpart Human Capital Manager of the West Region named Tina Rojas, who lived in Arizona.

Vivint's job description for this role states that Clark "is the first contact assigned to the business unit for all things HR." ECF No. 82–5 at 3. It further states that in this position, Clark "will handle performance management, organization effectiveness, compensation and benefits, onboarding, and training." *Id.* The job description delineates that the position holder must: "integrate various HR products, services, and processes"; "[i]nterpret organizational strategies and offer up appropriate HR solutions"; "[w]ork with managers to establish and maintain competitive programs that attract and retain high quality employees in a cost effective manner"; "[c]ollaborate, develop and deliver HR policies, practices, and procedures that guide the business while achieving compliance"; "[p]articipate in the internal marketing of HR to the rest of the organization"; "[i]mplement HR policies as a generalist"; "[p]artner with business operations to ensure a complete understanding of business needs"; and serve as an "HR liaison for . . . succession planning, talent management, employee relations, compensation, benefits, EEO, and/or training and development objectives and resolves HR issues." *Id.* The job also required "5 years experience as an HR Generalist with hands on experience in performance management and/or talent management initiatives, with a track record of receiving increased responsibilities." *Id.* at 2. Clark testified that she performed these listed functions in her Human Capital Manager East Region position. *See* ECF No. 70–2 at 6–7, 10.

Around this time, Vivint also hired Allred for a new Human Capital Partner position. Vivint created the new position with the expectation that Allred would perform HR duties specifically focused on the Sales Department. White had previously worked with Allred years earlier at a different company. Although she knew that Allred did not have any HR experience, White decided

to offer Allred the position on January 28, 2015 because she liked his prior work performance and knew he was a police officer earlier in his career. White did not post the position publicly or internally for Vivint employees and did not consider Clark for the HR Capital Partner position because White believed Clark was not "the right fit for Sales." ECF No. 82–11 at 6. Clark and other employees were surprised by Allred's hire given his lack of HR experience.

Soon after Allred's hiring, Clark saw Allred's offer letter and learned that he would be paid $120,000/year, with a 20% bonus. Vivint had previously hired Sharon Wilcken as a Human Capital Partner in February 2014 and paid her $49,224/year. Because of Allred's inexperience, Vivint assigned Clark and Rojas to support his HR responsibilities related to Sales, including by continuing to conduct some onboarding and employee relations functions such as investigations. *See* ECF No. 82–12 at 1–2.

Allred's Human Capital Partner job description is nearly identical to Clark's Human Capital Manger job description. Both job descriptions state that the employee would be "the first contact with assigned business units for all things HR related, such as performance management, organization effectiveness, compensations and benefits, onboarding, or training needs." ECF No. 82–5 at 1, 3. Like Clark's job description, the Human Capital Partner responsibilities also stated that Allred must "integrate various HR products/services/processes"; "[i]nterpret organizational strategies and offer up appropriate HR solutions"; "[w]ork with managers to establish and maintain competitive programs that attract and retain high quality employees in a cost effective manner"; "[c]ollaborate on development and delivery of HR policies, practices, and procedures that guide the business while achieving compliance"; "[p]articipate in the internal marketing of HR to the rest of the organization"; "[i]mplement HR policies as a generalist"; and serve as an "HR liaison

for . . . succession planning, talent management, employee relations, compensation, benefits, EEO, and/or training and development." *Id.* at 1.

### D.   CLARK'S WAGE DISCRIMINATION COMPLAINTS

In October 2014, after Vivint promoted Clark to HR Operations Manager but did not offer her a pay raise, Clark complained to Sadowski and White about her low salary compared to national statistics for equivalent HR roles. On February 4, 2015, after Clark's promotion to HR Manager of the East Region position without a pay increase or additional benefits like an office, Clark again raised concerns about her specific wage and complained of Vivint's gender pay gap. In this request for a raise, Clark identified that one male employee, Steve Littlefield, had recently been promoted to interim Manager of Recruiting Specialists and received a $40,000/year raise and a 30% bonus. *See* ECF No. 70–2 at 124. Clark also brought up Allred's $120,000/year salary and his similar role during her meeting with Sadowski, stating that she was "being significantly underpaid for the role that [she was] doing" and "that [Allred] was brought in at almost double [her] salary." *Id.* at 34.

### E.   CLARK'S PERFORMANCE REVIEWS

Clark received numerous positive performance reviews concerning her employment at Vivint. For example, on October 10, 2014, Clark received an email from White expressing White's gratitude for Clark's "dedication," "flexibility," and "work ethic" that "helped [Vivint] get through some very tough times," and White wrote that Clark's work was "integral and [Vivint] couldn't do it without [her]." ECF N0. 70–4 at 65. On April 23, 2015, White also observed:

> [Clark] was a hard worker, smart, extremely dedicated, and the glue that held us together. She worked until the job was done. She figured out solutions to problems. She never complained, and she was willing to do whatever tasks or challenges were thrown at her. . . . She is well rounded, having played so many parts in our fast-growing team. And because of that, she is also able to deal with

> ambiguity. A fast pace does not phase her in the least. She always
> gives her best no matter the circumstances.

ECF No. 70–4 at 41, 70.

### F.    CLARK'S TERMINATION

On April 16, 2015, Sadowski and another Human Capital Director, Jeremy Sabin ("Sabin"), informed Clark that she was being let go from her position as Human Capital Manager of the Eastern Region because Vivint wanted an employee to live within the Eastern region and Clark was living and working in Utah. Prior to this meeting, Vivint's Director of Recruiting, Mike Chonko, had informed Clark that White "wanted [her] gone" from the company and had scratched off her name from the organizational chart on a whiteboard during a meeting. *See* ECF No. 70–2 at 40–41.

During their meeting with Clark, Sabin and Sadowski told Clark that the change would take effect in forty-five days, during which Clark would assist with the transition, and that Clark would receive one month's severance pay after that transition time ended. White ultimately made the decision to relocate Clark's position in consultation with Sabin and Sadowski. After deciding to move Clark's position to the East Coast, Vivint did not offer her an opportunity to move with the position or to take any other positions with the company. Instead, White encouraged her to seek jobs at other companies. At the time of her termination, Vivint paid Clark $69,310/year. *See* ECF No. 82–10.

On April 28, 2015, Sabin emailed Vivint employees announcing the decision to relocate the Human Capital Manager East Region position to the East Coast and informing them that Clark would no longer hold the position. During the forty-five-day transition period after the April 16 meeting, Clark continued to work on HR matters such as investigating complaints of discrimination and harassment. At this time, Clark continued to work with Allred and help him

with "how to handle discrimination claims" and other sensitive investigations. ECF No. 70–4 at 51. Clark finished her employment at Vivint on June 5, 2015. But Vivint did not post the Human Capital Manager East Region position publicly until February 11, 2016. The posting indicated that the employee would work out of Westbury, New York. On May 16, 2016, Vivint hired an external candidate for the position.

## II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Instead, the court must "view all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (citation and alteration omitted).

## III.    DISCUSSION

Plaintiff raises various gender and religious discrimination claims under Title VII, as well as wage discrimination claims under the Equal Pay Act. In Plaintiff's first cause of action, she

alleges that Defendant violated Title VII by discriminatorily limiting "her status, pay, opportunities for advancement and promotion" and "exclud[ing] her socially and professionally because of her gender and religion." Compl. ¶¶ 32–33. Plaintiff also alleges that Vivint discriminated against her and other female employees by "ignor[ing] [their] complaints of discrimination." *Id.* ¶ 36. In Plaintiff's second cause of action, she alleges that instead of addressing her complaints of gender discrimination, Defendant also violated Title VII by "terminat[ing] her for pretextual reasons . . . in retaliation for complaining of discrimination." *Id.* ¶ 44. Plaintiff alleges in her third cause of action that Defendant violated the Equal Pay Act because it paid her less than her male comparators "beginning with her hiring in 2013 and continuing through her 2015 termination." *Id.* ¶ 51. In summary, the court understands Plaintiff's Complaint raises six theories of liability: (1) Equal Pay Act claims concerning a wage disparity between male and female employees; (2) Title VII disparate treatment claims based on gender; (3) Title VII disparate treatment claims based on religion; (4) Title VII wage discrimination claims based on gender; (5) Title VII wage discrimination claims based on religion; and (6) a Title VII retaliation claim concerning Defendant's response to Plaintiff's complaints of gender discrimination.

Defendant moved for summary judgment only on Plaintiff's Equal Pay Act claims, Title VII gender wage discrimination claims, and Title VII retaliation claim. *See* ECF No. 70 at 6. Defendant does not specifically address Plaintiff's religious discrimination claims because it believed that these claims are "not separate and distinct from her claim for gender discrimination." *Id.* at 35 n.5. At oral argument, however, counsel for Plaintiff conceded that her Title VII wage discrimination claim based on religion fails. The court accordingly grants summary judgment for Defendant as to this claim.

Defendant's Motion also does not address Plaintiff's disparate treatment claims based on either gender or religion, even though her Complaint contains such claims. *Id.* ¶¶ 32–36. Instead, Defendant addresses these issues for the first time in its reply memorandum. *See* ECF No. 91 at 31–32. As the Tenth Circuit has unequivocally stated, "[i]ssues not raised in the opening brief are deemed abandoned or waived." *Riser*, 776 F.3d at 1201 (citations omitted); *see also Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived.").[2] Thus, the court does not consider Defendant's arguments concerning Plaintiff's disparate treatment claims because Defendant failed to raise arguments against those theories of liability in its Motion.

In resolving the claims on which Defendant did move for summary judgment, the court first addresses the parties' various evidentiary disputes. Next, the court analyzes Plaintiff's Equal Pay Act claims and concludes that there are genuine disputes of material fact that preclude summary judgment. Viewing the disputed facts and inferences in Plaintiff's favor, a reasonable jury could find that Defendant maintained a gender pay disparity that violates the Equal Pay Act. The court reaches the same result on Plaintiff's Title VII gender wage discrimination claims. The court then turns to Plaintiff's Title VII retaliation cause of action and enters summary judgment in favor of Defendant on that claim. Finally, the court considers Defendant's argument for partial summary judgment against plaintiff concerning any purported wage discrimination that she experienced in her first role at Vivint as an HR Generalist.

---

[2] As this court recently stated, "[i]t is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work-framing the argument, and putting flesh on its bones through a discussion of the applicable law and facts." *Butler v. Cardiff Healthcare, Inc.*, No. 2:17-CV-01114-JNP, 2019 WL 3752574, at *8 (D. Utah Aug. 8, 2019) (unpublished) (citation omitted).

### A.   EVIDENTIARY DISPUTES

The court first address the parties' various evidentiary disputes. Defendant asks the court to (1) disregard testimony concerning Mike Chonko as hearsay, (2) disregard Exhibit 7 to Clark's Deposition because it is hearsay, and (3) disregard evidence of Sharon Wilcken's ("Wilcken") salary because it is irrelevant. Plaintiff asks the court to disregard Shelly Sperling's ("Sperling") declaration attached to Defendant's motion because Defendant failed to properly disclose Sperling as a witness under Federal Rule of Civil Procedure 26. For the following reasons, the court disregards testimony concerning Chonko and the Sperling declaration, but will consider Exhibit 7 to Clark's Deposition and information concerning Wilcken's salary.

### 1.   Mike Chonko's Statements

Plaintiff's response memorandum cites to passages in Clark's deposition in which Clark recalled that Mike Chonko ("Chonko"), Vivint's Director of Recruiting, informed Clark that White "wanted her gone" and that he knew White crossed Clark's name off an organizational chart on a white board saying "we need her gone." *See* ECF No. 81 at 26. Defendant contends that Clark's recitation of what she heard from Chonko about White is "hearsay within hearsay" prohibited under Federal Rules of Evidence 801 and 805. ECF No. 91 at 10. Plaintiff responds with three arguments as to why the statements are not impermissible hearsay: (1) Chonko and White are both party opponents, (2) Plaintiff could present Chonko's statements in an admissible form through his anticipated testimony at trial, and (3) Plaintiff presents these statements for their effect on Clark and not for their truth. ECF No. 98 at 1–2. "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'" *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Celotex*, 477 U.S. at 324). Here, Plaintiff's arguments that the statements may be admitted to prove the matter they assert are foreclosed by

the Tenth Circuit's decision in *Johnson v. Weld County, Colorado*, 427 F.3d 1303 (10th Cir. 2005). However, the court will consider the statements for their effect on Clark as the listener.

*Johnson* held that "an employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." *Id.* at 1209 (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005)). Here, although White is properly considered a party opponent, Plaintiff has not demonstrated beyond conjecture that Chonko was involved with the decision to relocate Clark's position. Plaintiff recognizes that Sabin, Sadowski, and White were involved in the decision, but Plaintiff does no more than speculate that Chonko also participated. Thus, under *Johnson*, Plaintiff has not demonstrated that Chonko is a party opponent for purposes of the hearsay rule. *See, e.g.*, *Talbott v. Pub. Serv. Co. of New Mexico*, No. CV 18-1102 SCY/LF, 2020 WL 2043481, at *7 (D.N.M. Apr. 28, 2020) (analyzing *Johnson* and reaching similar result where the plaintiff had not demonstrated that the declarant had "decision-making authority related to Plaintiff's employment").

*Johnson* also ruled that although "the form of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial, 'the content or substance of the evidence must be admissible.'" 427 F.3d at 1210 (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)). There, like here, the plaintiff sought to introduce a party-opponent supervisor's statements through other employees' recitation of the supervisor's remarks about the plaintiff. *Id.* at 1208. The court in *Johnson* rejected the plaintiff's invitation to consider the otherwise hearsay "statements because they could be replaced at trial by admissible evidence, namely their live testimony." *Id.* at 1209. Plaintiff makes the same argument in support of considering Chonko's purported testimony here, *see* ECF No. 98 at 3, but the court must reject it under *Johnson*.

While Chonko's alleged statements may not be admitted to prove that Defendant intended to terminate Clark, they may be admitted for their effect on Clark as the listener. Chonko's statements are relevant to determining the reasonableness of Clark's decision not to seek continued employment with Vivint. In short, Chonko's alleged statements are not admissible to establish when Vivint decided to terminate Clark, but they are admissible for the purpose of determining whether Clark's actions, such as failing to pursue a transfer, were reasonable.

### 2. Clark's Notes

Defendant also objects on hearsay grounds to Exhibit 7 to Clark's Deposition, which is a compilation of Clark's notes concerning the alleged adverse treatment she experienced at Vivint. *See* ECF No. 70–2 at 124–127. Specifically, Defendant argues the notes are not admissible to support Clark's contention that "Clark was aware that a male employee, Steve Littlefield, who had been made an interim Manager of the Recruiting Specialists received a $40,000 raise and a 30% bonus with the new position." ECF No. 91 at 11–12. Defendant's objection is to the *form* in which Plaintiff presents this evidence, rather than its *content*. This objection fails because "the form of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial," and only "the content or substance of the evidence must be admissible." *Johnson*, 594 F.3d at 1210 (citation omitted). For example, an affidavit may be considered on summary judgment, even though it is "a *form* of evidence that is usually inadmissible at trial given our adversarial system's preference for live testimony." *Id.* Here, although the content or substance may be currently presented in an inadmissible form in Clark's typed notes,[3] at trial she may present the same content in an admissible form through live testimony without the alleged hearsay problems. Thus, the court will consider Exhibit 7 to Clark's Deposition.

---

[3] The court does not reach the issue of whether Plaintiff's typed notes are themselves admissible as a present sense impression or for any other reason.

### 3.    Sharon Wilcken's Salary

Defendant objects on relevance grounds to Plaintiff's factual contentions that Allred was hired in early 2015 at $120,000 per year but that "Vivint hired Sharon Wilcken as a Human Capital Partner on February 24, 2014," at a salary of $49,224 per year and that Wilcken "received a raise to $54,000 per year in May 2015 due to increased responsibilities provided with the recent Ops and Install organizational change." ECF No. 91 at 13. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. The "standard of relevance . . . is a liberal one." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993). "As a general rule . . . 'the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.'" *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (citation omitted). Thus, the wage that Vivint paid Wilcken is relevant to Clark's discrimination claims.

### 4.    Shelly Sperling's Declaration

Finally, Plaintiff objects to Defendant's use of Sperling's declaration because she "was not disclosed as a potential witness" and this "failure to disclose" prejudiced Plaintiff because it prevented her "from having the opportunity to depose her or cross examine her on the statements in the declaration." ECF No. 81 at 19. Plaintiff is correct that Defendant did not disclose Sperling as a potential witness. *See* ECF No. 98–2. The court construes Plaintiff's argument as invoking Federal Rule of Civil Procedure 26(a)(1)(A)(i), which states that a party must provide to opposing parties "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Parties are required to make their "initial disclosures based on the information then reasonably available" and they are "not excused from

14

making [their] disclosures because [they have] not fully investigated the case." FED. R. CIV. P. 26(a)(1)(E). Further, under Rule 26(e), these initial disclosures must be supplemented "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e).

"As a sanction for violating this rule, 'the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or is *harmless.*'" *Deere v. XPO Logistics Freight, Inc.*, 798 F. App'x 278, 283 (10th Cir. 2020) (unpublished) (quoting FED. R. CIV. P. 37(c)(1)); *see also Smith v. Elva Grp., LLC*, No. 1:13-CV-00028-DS-DBP, 2015 WL 2384037, at *1 (D. Utah May 19, 2015) (unpublished) ("A failure to properly disclose a witness may result in exclusion of the witness from subsequent hearings."). "Courts have discretion in assessing harmlessness and should consider whether: (1) the opposing party is prejudiced; (2) the prejudice can be cured; (3) the proceedings would be disrupted; and (4) the party acted in bad faith." *Deere*, 798 F. App'x at 283  (citing *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).  But the court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose" for all of these considerations. *Woodworker's Supply*, 170 F.3d at 993. The court considers each of these factors in turn.

First, Plaintiff is prejudiced by Defendant's failure to disclose Sperling as a witness. As this court has recognized, the prejudice of a proponent party's nondisclosure "is apparent" when, as here, the opposing party "received the first indication that [the non-disclosing party] would rely on that evidence" during summary judgment briefing. *See XMission, L.C. v. Adknowledge, Inc.*, No. 2:15-CV-277-TC, 2016 WL 3562039, at *8 (D. Utah June 24, 2016) (unpublished). Defendant

argues, however, that its Rule 26 disclosure violation was harmless because Clark can later depose Sperling or ask her questions at trial regarding the contents of her declaration. But under the Federal Rules, witnesses such as Sperling are "required to be included in [the proponent party's] initial disclosures, regardless of whether they may testify at trial." *Borandi v. USAA Cas. Ins. Co*., No. 2:13-CV-141-TS-PMW, 2014 WL 4955778, at *3 (D. Utah Oct. 2, 2014) (unpublished). Defendant also argues that Plaintiff is not prejudiced because she should have been on notice that Defendant would use Sperling as a witness because Sperling is referenced in various discovery productions and depositions. But it is not Plaintiff's "responsibility to depose every individual referenced in either documents attached to [Defendant's] initial disclosures or during depositions. Instead, it was [Defendant's] burden to disclose" its potential witnesses under Rule 26. *See id.*; *see also Hornady Mfg. Co. v. Doubletap, Inc.*, No. 2:11-CV-18 TS, 2013 WL 1693678, at *2 (D. Utah Apr. 18, 2013) (unpublished) (recognizing that references to the witness "in and amongst other discovery materials . . . is insufficient to put [the opposing party] on notice of [the witness's] identity and the subject matter of discoverable information she might provide"). Thus, Plaintiff was prejudiced by Defendant's nondisclosure. The fact that Sperling may testify at trial or that Sperling is mentioned elsewhere in discovery productions does not justify Defendant's nondisclosure or ameliorate the prejudice to Plaintiff.

Second, the prejudice from Defendant's nondisclosure cannot be cured without further disruption to these proceedings. Defendant argues that "any possible prejudice can be remedied by allowing Clark to depose Sperling on the contents of her declaration," but then Defendant also argues that "such a deposition is not warranted" because "Clark has not identified what information she seeks" from Sperling. ECF No. 91 at 15. By offering and then resisting in consecutive sentences the possibility of Plaintiff deposing Sperling, Defendant demonstrates that its cure

proposal is a feigned overture. Regardless, an offer to depose "is not a reasonable accommodation to remedy the prejudice occasioned by [Defendant's] failure to include [Sperling] in [its] initial disclosures and provide [Plaintiff] with any meaningful opportunity to conduct discovery" before the court decides this Motion. *See Borandi*, 2014 WL 4955778, at *4. Moreover, permitting Clark to depose Sperling and thereby cause further "delay in resolution of [the] summary judgment issues [is itself] prejudicial" to Plaintiff. *See XMission, L.C.*, 2016 WL 3562039, at *8 (citation omitted). Because Defendant did not comply with Rule 26(a) or 26(e) by failing to disclose Sperling, the court will disregard her declaration for purposes of this Motion because Defendant's nondisclosure was not substantially justified and caused Plaintiff prejudice.

### B. EQUAL PAY ACT WAGE DISCRIMINATION CLAIMS

Plaintiff claims that Vivint violated the Equal Pay Act by paying Strong and Allred more than Clark for substantially equal work. The Equal Pay Act prohibits wage discrimination "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). The Equal Pay Act "impos[es] a form of strict liability on employers who pay males more than females for performing the same work—in other words, the plaintiff . . . need not prove that the employer acted with discriminatory intent." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310–11 (10th Cir. 2006) (citations omitted). To establish a prima facie case of wage discrimination under the Equal Pay Act, Plaintiff must demonstrate: "(1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances." *Riser*, 776 F.3d at 1196 (quoting *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997)). "An [Equal Pay Act] plaintiff is not required to demonstrate that males, as a

class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex." *E.E.O.C. v. Maryland Ins. Admin.*, 879 F.3d 114, 122 (4th Cir. 2018) (citation omitted).

Plaintiff identifies Scott Strong as the relevant higher-earning male comparator for her Human Capital Operations Manager role and Anthony Allred as the same for her Human Capital Manager East Region role. Defendant does not dispute that the conditions of Clark's employment were basically the same as Strong's and Allred's or that Vivint paid these male employees more than Clark. Rather, Defendant argues only that the content of Clark's job was not "substantially equal" to the jobs that Strong and Allred performed.[4]

Under the Equal Pay Act, work is "substantially equal" if it requires "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). "What constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined," 29 C.F.R. § 1620.14(a), but the Tenth Circuit has attempted to delineate that "[s]kill includes such considerations as experience, training, education, and ability"; "[e]ffort refers to the physical or mental exertion necessary to the performance of a job"; and "[r]esponsibility concerns the degree of accountability required in performing a job," *E.E.O.C. v. Cent. Kansas Med. Ctr.*, 705 F.2d 1270, 1272 (10th Cir. 1983) (citation omitted), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). "In

---

[4] The Equal Pay Act also provides four affirmative defenses for employers to justify gender pay disparities "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The employer has the burden of persuasion, and "in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." *Mickelson*, 460 F.3d at 1311 (citation omitted). Because Defendant raises the defense that any wage disparities are based on factors other than gender for the first time in its reply memorandum, however, the court does not consider this affirmative defense on summary judgment. *See Riser*, 776 F.3d at 1201 (citation omitted).

interpreting these key terms . . . , the broad remedial purpose of the [Equal Pay Act] must be taken into consideration." 29 C.F.R. § 1620.14(a); *accord Corning Glass Works v. Brennan*, 417 U.S. 188, 208 (1974) ("The Equal Pay Act is broadly remedial, and it should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve.").

Although "[i]t is not sufficient that some aspects of the two jobs were the same," *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 560 (10th Cir. 1981), it is also true that "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable," *Riser*, 775 F.3d at 1196 (quoting 29 C.F.R. § 1620.14(a)). Thus, the requirement for the plaintiff to show that she and her male comparator are "substantially equal" does not mean they must be "identical." 29 C.F.R. § 1620.14(a). Rather, the question is whether the "core functions" of the plaintiff's and the comparator's jobs require substantially equal skill, effort, and responsibility. *See Riser*, 775 F.3d at 1196. In making this determination, the court is guided by two additional principles: (1) "[j]obs may be equal even though one sex is given extra duties if the other sex also performs extra duties of equal skill, effort and responsibility, or if the extra tasks take little time and are of only peripheral importance," *Cent. Kansas Med. Ctr.*, 705 F.2d at 1273; and (2) "the fact that a female employee performed additional duties beyond a male comparator does not defeat the employee's prima facie case under the [Equal Pay Act]," *Riser*, 775 F.3d at 1197 (citations omitted).

The court concludes that material disputes of fact preclude summary judgment on Plaintiff's Equal Pay Act claims. Viewing the facts in Plaintiff's favor, Plaintiff has established sufficient evidence for a reasonable jury to find that both Strong and Allred performed substantially equal work to Clark for Plaintiff's Equal Pay Act wage discrimination claims.

1.     **Strong Comparator**

Genuine disputes of material fact exist as to whether the skill, effort, and responsibility required for Clark's work as Human Capital Operations Manager was "substantially equal" to Strong's position. Defendant distinguishes Strong from Clark by relying on White's testimony that Strong was in charge of "building systems" for Vivint and fulfilling a higher-level strategic policymaking role for HR services at the company. ECF No. 70–4 at 5. Plaintiff, on the other hand, indicates that Strong was not at a higher level than Clark because White informed Clark that she took over Strong's role in full when he left the company, including managing his team of eighteen direct report employees. *See* ECF No. 70–2 at 18. Clark also testified that after taking over Strong's management position, she too performed higher-level systems development work by collaborating with a group to "put[] together ideas [and] com[e] up with a process" for improving Vivint's HR systems. *See id.* at 11–12. Moreover, Clark testified that both she and Strong reported directly to White on various HR issues, particularly concerning results of background checks from prospective employees. *Id.* at 6–7. The substantial equality between Clark's and Strong's jobs is corroborated by Vivint's job descriptions, which show that the two positions have substantially equal responsibilities and require substantially equal skill and qualifications. *Compare* ECF No. 82–5 at 3 *with id.* at 4–5.[5] Specifically, duties Clark fulfilled after taking over Strong's role—such as managing and implementing investigations, onboarding, compliance, employee relations tasks,

_____

[5] Although Defendant is correct that the Tenth Circuit in *Riser v. QEP Energy* stated that the Equal Pay Act "substantially equal" determination "turns on the actual content of the job—not mere job descriptions or titles," 775 F.3d at 1196 (citation omitted), Defendant fails to recognize that the *Riser* court then went on to twice discuss the comparator's job description in making its "substantially equal" determination in that case, *see id.* at 1196–97. Accordingly, although job descriptions are not dispositive, the duties and responsibilities outlined in the descriptions may corroborate other evidence concerning whether two different roles are "substantially equal" for an Equal Pay Act claim. *See, e.g.*, *Nulf*, 656 F.2d at 560 (analyzing duties assigned in job description, among other considerations); *Baumgardner v. ROA Gen., Inc.*, 864 F. Supp. 1107, 1110 (D. Utah 1994) (same); *Woodward v. Heritage Imports*, 773 F. Supp. 306, 313 & n.8 (D. Utah 1991) (same).

training and development, and various tax audit facilitation—are the same responsibilities described in Strong's Human Capital Director job description when he held that role. *See id.* at 4.

In summary, there remain genuine disputes of material fact concerning Strong's job duties and the degree to which his work overlapped or was otherwise equated in skill, effort, and responsibility to Clark's job duties as HR Operations Manager. Viewing the disputed facts in Plaintiff's favor, as the court must, a reasonable jury could find that Clark, in taking over Strong's position after his termination, performed substantially equal work compared to the work Strong performed before he left Vivint. Indeed, a reasonable jury could conclude that when Clark was promoted to HR Operations Manager in October 2014, "any changes" to the nature of the same position that Strong held in the link on Vivint's corporate chain "dealt with how the job was performed" but "the core functions of the position remained intact." *See Riser*, 776 F.3d at 1194–95.

### 2.    Allred Comparator

Genuine disputes of material fact exist as to whether the skill, effort, and responsibility required for Clark's position as the Human Capital Manager for the East Region were "substantially equal" to Allred's position as a Human Capital Partner. Defendant contends that Allred was at a higher level than Clark at Vivint because he was involved in more strategic partnerships between HR and the Sales department, he liaised more often with Vivint's senior leadership, and he conducted higher stakes investigations. *See* ECF No. 91 at 23–26. But Clark testified that she and Allred performed equal work for different parts of the company. Clark testified that Vivint merely hired Allred to conduct the same "HR functions . . . solely for sales" employees that Clark was already doing for Vivint's operations employees by "working with the branch managers, with the electricians, the technicians, and so forth." ECF No. 70–2 at 23–24.

For example, Vivint assigned both Clark and Allred the responsibility of conducting investigations into employee misconduct. This investigatory overlap is indicated in White's May 6, 2015 email to both Clark and Allred, which states that a certain internal discrimination complaint matter "belongs to you [Allred]," but because Allred was new and the matter was sensitive, "[Clark] will need to handle the investigation with white gloves." ECF No. 70–4 at 51. White's deposition testimony further suggests that she asked Clark on other occasions to work with Allred on investigations that otherwise fell within Allred's responsibilities but that needed Clark's assistance "to be handled carefully." *Id.* at 43. Vivint also assigned onboarding and performance management responsibilities to both Allred and Clark, including running and processing background checks, disciplinary tasks such as determining whether an employee should be terminated, and investigating allegations of fraud as well as other employee relations functions. *See, e.g.*, ECF Nos. 70–2 at 21–23; 70–6 at 41; 82–6 at 3–4.

To corroborate Plaintiff's identified overlap between the skill, effort, and responsibility required for Clark's and Allred's jobs, Plaintiff also emphasizes that Vivint's job descriptions for Clark's position and Allred's position are nearly identical, with the exception that Clark's position seeks an applicant with some higher credentials. *See* ECF No. 82–2 at 1, 3. For example, both job descriptions state, using almost exactly the same language, that Clark's and Allred's primary function was to handle "performance management, organization effectiveness, compensation and benefits, onboarding, and training." *Id.* Both job descriptions indicate that Clark and Allred were responsible for "integrat[ing] various HR products/services/processes"; "[i]nterpret[ing] organizational strategies and offer[ing] up appropriate HR solutions"; "[w]ork[ing] with managers to establish and maintain competitive programs that attract and retain high quality employees in a cost effective manner"; "[c]ollaborat[ing] on development and delivery of HR policies, practices,

and procedures that guide the business while achieving compliance"; "[p]articipat[ing] in the internal marketing of HR to the rest of the organization"; "[i]mplement[ing] HR policies as a generalist"; and serving as an "HR liaison for . . . succession planning, talent management, employee relations, compensation, benefits, EEO, and/or training and development," among other duties. *Id.* at 1; *see also id.* at 3.

Finally, many of the points of distinction Defendant raises between Clark and Allred are either immaterial or occurred after Clark left the company. For example, Defendant emphasizes that Allred worked on Vivint's potential merger with another company during Summer 2015, but that was after Clark had already ended her employment at Vivint. *See Riser*, 776 F.3d at 1197–98 (ruling that post-termination duties are irrelevant). Further, Allred's prior experience as a police officer is not an important consideration because such experience is not required or particularly relevant to the HR duties Allred and Clark performed. *See, e.g.*, *Mickelson*, 460 F.3d at 1314 (declining to consider certain experience distinctions that are not required or relevant for the job duties assigned). Moreover, the fact that Allred provided HR functions with a focus on Vivint's sales employees rather than operations employees is not sufficient to show that Allred and Clark performed different tasks. *See* 29 C.F.R. § 1620.14(c) ("[T]he fact that jobs are performed in different departments or locations within the establishment would not necessarily be sufficient to demonstrate that unequal work is involved where the equal pay standard otherwise applies.").

Defendant also attempts to distinguish Allred from Clark by arguing that Clark performed more numerous investigations than Allred. But "the amounts of time which employees spend in the performance of different duties are not the sole criteria." 29 C.F.R. § 1620.14(c). Instead, a reasonable jury could find that Clark was assigned more investigations because she was more effective than Allred, especially in light of Vivint higher-ups (such as Sadowski and White) asking

Clark to assist Allred on this function and particularly for certain sensitive matters. *See, e.g.*, ECF Nos. 70–2 at 23–24; 70–4 at 43, 51; 82–12 at 1–2. What's more, the additional tasks that Clark conducted "beyond [her] male comparator does not defeat the employee's prima facie case under the [Equal Pay Act]." *Riser*, 776 F.3d at 1197 (citations omitted). For example, Plaintiff observes that Clark was in charge of managing direct-report employees and facilitating more onboarding tasks, whereas Allred did not manage employees or conduct as much onboarding beyond background checks. These purported "differences in skill, effort or responsibility . . . do not justify" finding that two jobs are unequal under the Equal Pay Act "where the greater skill, effort, or responsibility is required of the lower paid [gender]." 29 C.F.R. § 1620.14(a).

The thin distinctions that Defendant emphasizes concerning the types of duties that Allred and Clark performed merely represent "job differences that are 'not significant in amount or degree'" and are insufficient to "support a wage differential" between employees. *Riser*, 776 F.3d at 1198 (citation omitted). *See also Cent. Kansas Med. Ctr.*, 705 F.2d at 1273 (finding that differences in the comparators duties may be "equalized by additional responsibilities" requiring similar skill and effort by the plaintiff). Therefore, resolving disputed facts in Plaintiff's favor, a reasonable jury could find that the skill, effort, and responsibility required to perform Clark's job was "substantially equal" to that required to perform Allred's job.

In sum, there remain genuine disputes of material fact concerning (1) whether Clark's position as Human Capital Operations Manager involved duties and required skill, effort, and responsibility that were substantially equal compared to those in Strong's position as Human Capital Director when Clark took over Strong's position in October 2014; and (2) whether Clark's position as Human Capital Manager East Region involved duties and required skill, effort, and responsibility that were substantially equal to those in Allred's role as Human Capital Partner while

24

Clark and Allred worked these positions at the same time in early 2015. Viewing these disputed facts in favor of Plaintiff, a reasonable jury could conclude that Vivint violated the Equal Pay Act by paying Strong and Allred nearly double what Vivint paid Clark.

### C.   TITLE VII WAGE DISCRIMINATION

Plaintiff also brings Title VII claims of wage discrimination based on her gender. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation . . . because of such individual's" gender. 42 U.S.C. § 2000e-2(a)(1). Unlike the Equal Pay Act, Title VII requires that "a plaintiff must prove that the employer intentionally discriminated against her because of her [gender]." *Mickelson*, 460 F.3d at 1311 (citing *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1306 (10th Cir. 2005)). Where a plaintiff seeks to use circumstantial evidence to make her discriminatory intent showing, the court employs the familiar *McDonnell Douglas* burden-shifting framework. *Riser*, 776 F.3d at 1199–200 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework:

> First a plaintiff must establish a prima facie case of pay discrimination. If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant does so, the burden shifts back to the plaintiff to show that his or her protected characteristic was "a determinative factor in the defendant's employment decision" or that the defendant's explanation was merely pretextual.

*Id.* at 1200 (citation omitted). To demonstrate a prima facie case of gender-based wage discrimination under Title VII, Plaintiff must show: "(1) she is a member of a protected class, . . . and (2) she occupied a job similar to higher paid jobs occupied by . . . male employees." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 636 (10th Cir. 2012) (citing *Mickelson*, 460 F.3d at 1311).

Defendant contends that it is entitled to summary judgment on Plaintiff's Title VII wage discrimination claims by relying on the argument that Clark is not similarly situated to Strong or

Allred. *See* ECF No. 70 at 36–38. However, as Defendant concedes, job similarity requirements under Title VII are less stringent than under the Equal Pay Act. *See* ECF No. 91 at 36. Thus, the court's Equal Pay Act conclusion concerning the substantial equality between Strong's and Allred's positions and Clark's positions also applies to the analysis for Plaintiff's Title VII wage discrimination claims. Accordingly, the court denies summary judgment on these claims.

### D. TITLE VII RETALIATION CLAIM

Plaintiff also alleges that Defendant retaliated against her in violation of Title VII when Vivint relocated her position and failed to offer her a transfer after she had twice complained of discriminatory treatment and gender pay gaps at Vivint. Title VII retaliation claims also employ the same *McDonnell Douglas* burden-shifting approach described above. *See Argo*, 452 F.3d at 1202. To state a prima facie Title VII retaliation claim, a plaintiff must demonstrate: "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–68 (2006)) (footnote omitted). At the second step, the Supreme Court has clarified that the adverse action is anything that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. "Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. The burden then shifts back to the plaintiff to show that the employer's proffered reason is pretext." *Mickelson*, 460 F.3d at 1316 (citations omitted).

Here, Defendant contends that Clark has not established causation and that Clark has failed to show that Vivint's proffered nondiscriminatory justification for its actions was pretextual. *See* ECF No. 70 at 40 & n.6. Accordingly, the court assumes for purposes of this Motion that Clark

26

engaged in protected activity by complaining of alleged gender discrimination at Vivint and that she experienced a materially adverse action when Vivint relocated her position to the East Coast and failed to offer her a transfer.

### 1.  Causal Connection Between Protected Activity and Adverse Action

The Tenth Circuit has held that a "retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted). The closer the adverse employment action occurs to the protected activity, the more likely it is to evidence a causal connection. *Id.* A one-and-a-half-month period may, by itself, establish causation. *Id.* (citing *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994)). On the other hand, a three month period, without additional evidence, may not support a finding of causation. *Id.* (citing *Richmond v ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

Defendant points out that Clark raised complaints about her pay on February 4, 2015, and that it was not until April 16, 2015 that Sadowski and Sabin informed her that her position was being relocated. Defendant asserts that this period of about ten weeks is too long, without additional evidence, to establish causation. It further asserts that Clark has pointed to no such additional evidence.

Clark responds that causation may be established solely by temporal proximity, and that even if it could not, she has provided additional evidence of causation. To support her temporal proximity argument, she points to White's testimony that Sadowski and Sabin had discussed relocating Clark's position for some time before bringing it up with White. White also testified that Sadowski made the initial decision to relocate the position, although White had final say in the matter. Clark asserts that, drawing reasonable inferences in her favor, these facts suggest that the temporal proximity was closer than ten weeks. Clark also argues that two additional facts

27

support a finding of causation: she was not offered the opportunity to transfer with the position,[6] and Defendant hired Jennica Zern to a nearly identical position, Human Capital Manager, four days after Clark was notified of her termination.

The temporal proximity question in this matter presents a thorny line-drawing problem. Ten weeks falls in between the six-week period in *Ramirez*, 41 F.3d at 596, and the three-month period in *Richmond*, 120 F.3d at 209. Fortuitously, the Tenth Circuit's decision in *Anderson* provides some guidance. In that case, the court faced a time period very similar to the one in this case—the employer's adverse action came two months and one week after the plaintiff's protected activity. *Anderson*, 181 F.3d at 1179. The *Anderson* court likewise acknowledged that this presented a line-drawing problem. *Id.* While it ultimately did not decide whether the nine-week period alone could establish causation,[7] the fact that the Tenth Circuit panel recognized it as a close question militates against Defendant's argument that this court should declare, as a matter of law, that a ten-week period is too great to establish causation. In addition, the period here is almost certainly shorter than ten weeks—it is reasonable to infer that the decision to relocate Clark's position and terminate her came at some point before she was notified of the decision on April 16.

---

[6] Defendant argues that Clark's evidence on this point—statements made to her by Sabin and Sadowski during her meeting with them on April 16, 2015—constitute inadmissible hearsay. This is wrong—the statements are those of an opposing party under Federal Rule of Evidence 801(d)(2). Defendant argues that Sabin and Sadowski's statements do not qualify for this exception because Sabin and Sadowski had decision-making authority only over the decision to move the position to the East, but not specifically over Clark's termination. But those two moves were part and parcel—it would be disingenuous to attempt to separate them to make a technical evidentiary argument. Defendant also argues that White, not Sabin and Sadowski, had final decision-making authority over Clark's employment. But the case law does not require that an individual have final decisionmaking authority over the employment to qualify as a party opponent under Rule 801(d)(2); involvement in the decision-making process suffices. *See Johnson,* 437 F3d at 1209.

[7] The *Anderson* court did not decide the issue of temporal proximity because it concluded that even if the plaintiff established a prima facie case of retaliation, she could not show that her employer's proffered reasons for terminating her were pretextual. *See Anderson,* 181 F.3d at 1179.

Indeed, White testified that Sadowski came to her with the decision after having contemplated it for some time. And Vivint concedes that Sadowski had decision-making authority over this matter, even if it was not final decision-making authority. *See* ECF No. 91 at 33.

In addition to the temporal proximity of the protected activity and the adverse action, Clark presents additional facts that bolster her prima facie case of causation. She relies on statements by Sadowski and Sabin in their April 16, 2015 meeting with her. Clark testified that Sabin told her in the meeting that he did not think moving to the East was an option for her. Clark Depo. at 148:8–13. And while she expressed that she was "willing to explore the option [of moving with the position], and Sabin and Sadowski said they would "look at making arrangements" for her, Sabin and Sadowski never offered Clark the option of keeping her position. *Id.* at 149:1–20. Clark admits that she did not follow up with them, ask them to look into the matter, or further express interest in moving with the position. However, she repeatedly explained that this was because Sabin and Sadowski made it clear that it was not an option. *Id.* at 148:8–23; 150:12–19. Further supporting her contention that Vivint would not allow her to stay in her position is the fact that in the same meeting, Sadowski and Sabin indicated that her employment would end in 45 days and that she would receive severance pay. *See* ECF No. 70-2 at 126. That Clark was never offered the chance to keep her position supports her causation argument—it tends to show that the move to relocate the Human Capital Manager position to the East was motivated by Defendant's desire to be rid of Clark and was not purely a business decision.[8]

---

[8] In its Reply brief, Defendant argues that Plaintiff must show "but-for" causation—that but for the plaintiff's protected conduct, the employer would not have taken the action it did— to establish a prima facie case. *See* ECF No. 91 at 37 (citing *Melin v. Verizon Bus., Inc.*, 595 F. App'x 736, 738 (10th Cir. 2014). However, in its Motion, Defendant argued that but-for causation only applies at the pretext stage. *See* ECF No. 70 at 39 (citing *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 (10th Cir. 2015). Because it was raised for the first time in the Reply brief, the court will not consider the argument that but-for causation also applies at the prima facie showing stage. *See*

## 2. Pretext

Defendant's proffered nondiscriminatory justification for the adverse action of relocating Clark's Human Capital Manager of the East Region position to the East Coast is the benefit of having a regional HR manager physically "located within her geographic territory." ECF No. 70 at 42. Defendant argues that this justification is not pretextual because Defendant knew the advantages of such a relocation from observing "the benefits to having the West regional manager, Rojas, located within her geographic territory." *Id*. Defendant specifies that these geographic proximity benefits include enabling the regional manager to "regularly travel[] within [the territory] to visit locations and become familiar with employees at the different locations" with "more face-to-face interactions"; "notice things while visiting offices that she otherwise would not have had she been communicating by telephone," such as employees abusing worktime or improper storage of company materials; "respond quickly and in-person to investigations" as well as "have rapport with witnesses" and "assess credibility through witness demeanor"; and overall "buil[d] relationships with Vivint Solar employees in the field" to "achieve[] a higher level of trust than telephone conversations allowed." ECF No. 70 at 25–26.

To rebut Defendant's proffered justification of geographic proximity benefits, Plaintiff must "show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Mickelson*, 460 F.3d at 1315 (citation omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000) (holding

---

*Riser*, 776 F.3d at 1201. Even if the court required a showing of but-for causation at this stage, Plaintiff has satisfied that burden. As explained more fully in Section III.D.2 below, while Defendant may have had legitimate reasons to move the position into the region it served, it did not articulate a reason for failing to allow Clark to move with the position. In other words, it did not proffer a legitimate reason for terminating Clark.

that "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). "'[P]retext can be shown in a variety of ways,' and 'there is no one specific mode of evidence required to establish the discriminatory inference.'" *Riser*, 776 F.3d at 1200 (citation omitted). However, the court's role in examining a defendant's justification is not "to ask whether the employer's decision was 'wise, fair or correct, but whether [the employer] honestly believed the [legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs.'" *Johnson*, 594 F.3d at 1211 (citation omitted) (alterations in original). In other words, "[t]o support an inference of pretext, . . . a plaintiff must . . . come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.* Plaintiff's pretext "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Moreover, "[a]n articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (citations omitted).

Plaintiff offers several arguments to rebut Defendant's proffered justifications, but her strongest is that she was not offered the possibility to move with the position. Defendant's justifications focus on the wrong action—the relocation of the position, rather than on Clark's termination itself. Its proffered evidence tends to show why it relocated Clark's position—it wanted the Human Capital Manager to be located in the region he or she served. But that does not explain why Defendant did not want Clark to fill that position. In the same meeting in which Sabin

and Sadowski informed Clark that the position was to be relocated, they also informed her that she was to be terminated and receive a severance package in 45 days. [9]

Defendant responds that it did not deny Clark the chance to relocate with the position or reapply within the company. Rather, it asserts that Clark did not take affirmative steps to keep her position, other than once expressing her willingness to relocate in the April 16 meeting. Defendant further argues that even if Clark did come away with the impression that she could not continue working at Vivint Solar, this subjective belief is not enough to preclude summary judgment. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997) (explaining that an employee's "subjective belief of discrimination is not sufficient to preclude summary judgment.") (citation omitted). While it may be true that a plaintiff's subjective belief alone may not preclude summary judgment, a reasonable juror could find Clark's belief to have been *objectively* reasonable. An employee could reasonably believe that continued employment is no longer an option when she has been told that her supervisor "need[ed] her gone," *see* Clark Depo. 173:22–174:21, when she has been informed by her direct supervisors that her employment will terminate in 45 days, has been offered a severance package, and has been told that transferring to a new location is not an option. And a reasonable juror could find that an employee in such a position may reasonably believe that affirmatively seeking continued employment with the company would be futile.

Thus, while Defendant may have had legitimate, nondiscriminatory reasons for relocating the position, it has not offered a legitimate, nondiscriminatory reason for terminating Clark rather than offering her a chance to transfer. Clark offered additional facts to show that Defendant's justifications were pretextual, including that her position was not filled for over a year and that

---

[9] Defendant argues that Sabin and Sadowski's statements to Clark in the meeting are inadmissible hearsay, but as explained in the preceding section, this argument is unavailing.

Defendant hired Jennica Zern to a similar position around the same time Clark was terminated. But the court need not address these additional arguments because Defendant did not offer a legitimate reason for failing to offer Clark the opportunity to transfer and keep her position.

### E.   DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT

Defendant alternatively argues that if the court does not grant its Motion in its entirety, the court should enter partial summary judgment in favor of Defendant "on Clark's Title VII and [Equal Pay Act] claim for damages for the period of November 11, 2013 through October 20, 2014" because that period is not pertinent to Plaintiff's wage discrimination claims. ECF No. 70 at 43. Defendant argues that during this time, Clark worked as an HR Generalist at Vivint and Clark affirmed in her deposition testimony that Vivint did not pay her discriminatorily in this position. *See* 70–2 at 6. Plaintiff does not object to Defendant's request. Therefore, the court rules that the period of November 11, 2013 through October 20, 2014 will not be considered for any damages calculation for Plaintiff's Title VII and Equal Pay Act wage discrimination claims.

## IV.   ORDER

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically, the court:

1. Resolves the parties' evidentiary disputes by (a) disregarding Mike Chonko's statements insofar as they are offered to prove Vivint's intent to terminate Clark, but considering them insofar as they are offered for their effect on Clark; (b) considering Exhibit 7 to Clark's deposition to the extent the contents of that exhibit may be presented in an admissible form through Clark's testimony at trial; (c) considering Wilcken's Human Capital Partner salary as relevant evidence; and (d) disregarding Sperling's declaration because Defendant failed to disclose her as a witness under Rule 26;

2. DENIES summary judgment for Defendant on Plaintiff's Equal Pay Act wage discrimination claim;

3. DENIES summary judgment for Defendant on Plaintiff's Title VII wage discrimination claim based on gender and GRANTS summary judgment for Defendant on Plaintiff's Title VII wage discrimination claim based on religion;

4. DENIES summary judgment for Defendant on Plaintiff's Title VII retaliation claim; and

5. GRANTS partial summary judgment for Defendant concerning any alleged damages for the period of November 11, 2013 to October 20, 2014 on Clark's Equal Pay Act and Title VII wage discrimination claims.

Signed November 23, 2020

BY THE COURT:

Jill N. Parrish
United States District Court Judge